MARK A. LAUER (Bar No. 163756)
THOMAS W. LATHRAM (Bar No. 59639)
T. LESTER WALLACE (Bar No. 159967)
SILICON EDGE LAW GROUP LLP
6601 Koll Center Parkway, Suite 245
Pleasanton, California 94566
Telephone:     925-621-2110
Facsimile:     925-621-2119

Attorneys for Plaintiff
Alacritech, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| ALACRITECH, INC., | ) | Case No.: C04 03284 JSW |
| | ) | |
| Plaintiff, | ) | **ALACRITECH'S MOTION** |
| | ) | **FOR PRELIMINARY INJUNCTION** |
| v. | ) | **PURSUANT TO 35 U.S.C. § 283** |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | The Honorable Jeffrey S. White |
| Defendant. | ) | |

**TABLE OF CONTENTS**

                                                                           Page(s)

TABLE OF AUTHORITIES...........................................................…………iii

NOTICE OF MOTION AND STATEMENT OF RELIEF REQUESTED.......................v

SUMMARY OF ARGUMENT.........................................................…….vi

MEMORANDUM OF POINTS AND AUTHORITIES.........................................1

I.      Statement of Issues to be Decided…..........................................................1

II.     Statement of Facts……………….............................................................1

III.    Discussion…………………….................................................................5

        A.  The Standard for a Preliminary Injunction.............................................5

        1.      Alacritech Will Succeed on the Merits...........................................6

                i.      Claim Construction of Claim 1 of the '868 Patent...............6

                ii.     Microsoft Infringes Claim 1 of the '868 Patent...................7

                iii.    Claim 1 of the '868 Patent is Clearly Valid…......................8

        2.      Alacritech Will Suffer Irreparable Harm if the Injunction is Not Granted.....12

        3.      Balancing the Hardships Weighs Heavily in Alacritech's Favor...................14

        4.      The Public Interest Weighs in Favor of Granting the Injunction...................15

IV.     Conclusion…………………….................................................................15

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                        <u>Page(s)</u>

*Advanced Display Sys. v. Kent State Univ.*,

    212 F.3d 1272 (Fed. Cir. 2000)………………………………………………10

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,

    239 F.3d 1343 (Fed. Cir. 2001)………………………………………………12

*Atlas Powder Co. v. Ireco Chems.*,

    773 F.2d 1230 (Fed. Cir. 1985)…….……………………….....………….12

*Avia Group International, Inc. v. L.A. Gear California, Inc.*,

    853 F.2d 1557 (Fed. Cir. 1988)……………………………………....…11

*Cox et al v. Microsoft*,

    District of Maryland, 1:00-md-01332-JFM........................…………...5

*Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573

    (Fed. Cir. 1997)………………………………………..……….11

*Hewlett-Packard Co. v. Bausch & Lomb*,

    909 F.2d 1464 (Fed. Cir. 1990) ........................……………………...8

*InterTrust Techs. Corp. v. Microsoft Corp.*,

    N.D. Cal., C 01-1640 SBA………………………………...……5

*King Instruments Corp. v. Perego*,

    65 F.3d 941 (Fed. Cir. 1995)…………………………………………15

*Medtronic, Inc. v. Intermedics, Inc.*,

    799 F.2d 734 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987)……….……….9

*Oakley, Inc. v. Sunglass Hut Int'l*,

    316 F.3d 1331(Fed. Cir. 2003)…................................……...5, 6, 8, 12

*Panduit Corp. v. Dennison Mfg. Co.*,

    774 F.2d 1082 (Fed. Cir. 1985)…………………………………..10, 11

**Cases**                                                                    **Page(s)**

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*,

    85 Fed. Appx. 205 (Fed. Cir., 2003) ...........................……...……....5, 6, 12

*Polymer Techs. v. Bridwell*,

    103 F.3d 970 (Fed. Cir. 1996)…………………………...…………….……13

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,

    264 F.3d 1344 (Fed.Cir. 2001) …...................................................……....9

*Stac Electronics v. Microsoft Corp.*,

    Civil No. 93-0413-ER (C.D. Cal. 1994)……………………………………...5

*Stratoflex, Inc. v. Aeroquip Corp.*

    713 F.2d 1530 (Fed. Cir. 1983)……………………………………………...9

*United States v. Adams*,

    383 U.S. 39 (1966)……………………………………………...…………11

*U.S. v. Microsoft*,

    D.D.C 98-1232 (CKK), Final Judgment, November 12, 2002.............……………...8

*Vulcan Engineering Co., Inc. v. Fata Aluminum*, Inc.,

    278 F.3d 1366 (Fed. Cir. 2002), cert. denied, 123 S. Ct. 81 (2002)…………...…..11


**Statutes**

35 U.S.C. §282…......................……………………………….…….....................8

35 U.S.C. §283…......................…………………………………….....................1


## U.S. Constitution

Article I, § 8, clause 8. …………………………………….…………….15

## NOTICE OF MOTION AND STATEMENT OF RELIEF REQUESTED

On a date to be set by the Court, Alacritech, Inc. ("Alacritech") will move for a preliminary injunction against defendant Microsoft Corporation ("Microsoft") pursuant to 35 U.S.C. § 283. Along with this Motion, Alacritech is filing a Motion for an Order Shortening Time seeking an early date for a hearing on this matter.

Alacritech asks the Court to enjoin Microsoft from making, using, offering for sale, selling, importing or inducing others to use Microsoft's "Chimney" or "Longhorn" software, as more particularly specified in the Proposed Order Granting Alacritech's Motion presented herewith.

# SUMMARY OF ARGUMENT

In 1997, Alacritech invented a solution to a bottleneck in computer network communication. Claim 1 of Alacritech's U.S. Patent No. 6,697,868 ("the '868 patent") defines a fundamental invention in network interface software for computers, and claims priority to an Alacritech patent application filed in 1997. Microsoft infringes Claim 1 of the '868 patent, both directly and by inducing and contributing to infringement by others.

In 1998, Alacritech approached Microsoft to see if Microsoft would be interested in integrating Alacritech's network interface software into Microsoft's dominant Windows operating system. After Microsoft expressed interest, Alacritech provided demonstrations and detailed documentation of its technology to Microsoft under a non-disclosure agreement, including a specification describing how to integrate Alacritech's network interface software into Microsoft's operating system. Instead of working with Alacritech, Microsoft quit communicating with Alacritech in 1999.

In 2003, Microsoft announced a "new" network interface software architecture called "Chimney," which appeared to be copied from Alacritech's inventions. Alacritech put Microsoft on notice of infringement, but in 2004 Microsoft distributed DVDs containing infringing software and provided a public demonstration of infringement. Microsoft also disparaged Alacritech's products for having software that is incorporated rather than integrated into Windows, and told prospective Alacritech customers to wait until Chimney is publicly available. Microsoft further indicated that Chimney would be publicly released late in 2004, and that Chimney would become part of Microsoft's next operating system, code-named "Longhorn," which is now scheduled for release in 2006.

A public release of Microsoft's Chimney software would permanently change the competitive landscape for Alacritech, by unleashing a flood of infringing competition. Alacritech respectfully requests that this Court issue a preliminary injunction enjoining Microsoft from making, using, selling, offering for sale or importing Chimney software that can be added to an operating system and from making, using, selling, offering for sale or importing any operating system containing Chimney software.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    STATEMENT OF ISSUES TO BE DECIDED

Whether Microsoft should be enjoined from making, using, selling, offering for sale or importing into the United States any operating system that includes TCP Chimney software and any TCP Chimney software that can be incorporated into an operating system, on the grounds that such software infringes Claim 1 of Alacritech's U.S. Patent Number 6,697,868 ("the '868 patent") and further grounds that Microsoft has induced and contributed to infringement of Claim 1 of the '868 patent.

## II.    STATEMENT OF FACTS

Alacritech was founded in 1997 by Larry Boucher, inventor of the computer storage interface known as SCSI and founder of Adaptec, Inc. and Auspex Systems.  Declaration of Larry Boucher, ¶3.  One of Alacritech's goals was to accelerate communication between computers connected to a network.  Id, ¶4.  Alacritech identified the interface between the computer and the network as a bottleneck that slowed such communication, and invented hardware and software that overcame that bottleneck.  The problem that existed was that conventional network communication required excessive amounts of processing by the computer's central processing unit (CPU).  Networking protocols required that large messages such as file transfers be divided into smaller segments for transmission across the network, with multiple layers of control information added to each packet for transmission and those same layers for each packet decoded upon receipt.  Moreover, networks such as the Internet were designed so that most protocol processing was done at each end, allowing the routers of the network to quickly forward packets but requiring computers (called "hosts") at each end to perform complicated processing to control the communication.  Id.

The Transmission Control Protocol (TCP) was designed to ensure reliable data transmission, in part by establishing and maintaining a logical connection between hosts that wished to communicate, the logical connection including information at each host that identified both hosts and the application within each host that wished to communicate,

various other parameters, and the status of any communication involving the connection. TCP communication appeared to be too complicated to be processed by hardware, yet network speeds were outracing processor speeds so that even the fastest processors could barely keep up with protocol processing, leaving little CPU time for applications. Id., ¶5.

Alacritech solved this problem in part by creating a system that apportioned TCP processing between relatively straightforward TCP processing that could be performed in hardware on a network interface such as a NIC and more complicated TCP processing that was performed on the host processor. Because a TCP connection typically involves both straightforward and complicated processing, Alacritech invented the ability to transfer a connection between the NIC and the processor to allow the NIC to perform the straightforward processing, while leaving the complicated processing on the host processor. The resulting system dramatically increased network communication speed, while drastically reducing CPU utilization, and could be provided with a relatively inexpensive intelligent NIC and software on the host that could offload a TCP connection to the NIC. Id., ¶6. Alacritech filed a 128-page patent application in 1997 that describes this and other fundamental advances, from which the '868 patent claims priority. Declaration of Mark Lauer, ¶1.

Alacritech approached Microsoft in 1998 to see whether Microsoft would be interested in integrating the network interface software invented by Alacritech into Microsoft's dominant Windows operating system. Id., ¶8. After Microsoft expressed interest, Alacritech demonstrated its technology in confidence to Microsoft under a Nondisclosure Agreement. Declaration of Peter Craft, ¶¶3-5. Microsoft then requested more detailed information on integrating Alacritech's technology into Microsoft's operating system, and Alacritech provided to Microsoft additional confidential information relating to that integration. Id., ¶¶6-11. After receipt of this information, Microsoft presented a schedule for integrating Alacritech's technology into a future Windows operating system; however in mid-1999, Microsoft's networking communication group ceased communicating with Alacritech. Id., ¶12.

Later in 1999, Compaq Computer became interested in Alacritech's technology. Compaq wanted to install Alacritech's network interface cards in Compaq's servers, and

wanted Alacritech's network interface software to be integrated into Microsoft's operating systems. Id., ¶13. An email sent October 19, 1999 from Scott Johnson of Compaq to various Microsoft, Alacritech and Compaq employees, on the subject of "TCP/IP offloading discussion," states "Compaq's position with regard to the Alacritech technology." Id. The email notes "Alacritech has demonstrated the performance benefits of its technology when used with NT 4.0 to Compaq, and it is our understanding that they performed a similar demonstration at Microsoft." Id. After a meeting between Compaq and Microsoft, however, Compaq lost interest in Alacritech's technology. Id.

In 2000 Alacritech began selling advanced network interface cards that worked with Microsoft's Windows operating system. Boucher Dec., ¶11. Rather than integrating Alacritech's technology into the host computer operating system as Alacritech had proposed to Microsoft, Alacritech included network interface software (a protocol processing stack) that was installed with a card. Id. The installed Alacritech software instructions interacted with the Windows operating system through a standard interface that Microsoft provided for non-Microsoft networking software such as Novell Netware and Appletalk. Id.

On July 30, 2001, Larry Boucher sent an email to Bill Gates of Microsoft noting some of the benefits that a partnership between Alacritech and Microsoft could have. Mr. Gates did not respond to Mr. Boucher. Id., ¶12.

Although installing an extra protocol stack in the Windows operating system was not as efficient as an integrated stack would have been, Alacritech's products offered dramatic increases in network communication speed and efficiency. Id., ¶13. The performance improvement was so great that, in 2003, Microsoft used Alacritech's network interface cards and protocol processing stack to promote the release of Microsoft's Server 2003 operating system by demonstrating the industry's highest file system performance figures. Id.

In May of 2003, at Microsoft's Windows Hardware Engineering Conference (WinHEC 2003), Microsoft outlined a framework for a "new" network interface that Microsoft called "Chimney." Craft Dec., ¶13. Chimney seemed to be virtually identical to Alacritech's network interface software, and appeared to have been derived from the confidential

information that Alacritech had presented to Microsoft five years earlier.  Id, ¶7-11.

On October 3, 2003, Larry Boucher sent a letter to Jawad Khaki, Corporate Vice President of Windows Networking & Device Technologies at Microsoft.   Boucher Dec., ¶14.  The letter noted that Alacritech had disclosed its technology in confidence to Microsoft and that Chimney appears to function much like Alacritech's patented technologies.  Id.   The letter also stated: "At the point that Microsoft begins to build technology in the area of TCP offload, TCP acceleration, Direct Data Placement and RDMA, it may be of value to review our patents. This would allow Microsoft to either avoid the use of our intellectual property, or to discuss a license if some of our technology might be of benefit."  Id.   The letter also stated: "Examples of patents that may be of interest include U.S. Patent No. 6,427,171 and U.S. Patent Application 2001/0047433."  Id.  Application 2001/0047433 issued on February 24, 2004 as the '868 patent.

Brief but unsuccessful discussions involving a license to Alacritech's patents were held in late April of 2004.  Id, ¶15. Coincident with the breakdown in license negotiations, Microsoft sent a "Notification of Audit Failure" to Alacritech, which stated that all of Alacritech's products failed Windows Hardware Quality Laboratory (WHQL) audit testing, and that termination of Alacritech's Windows Logo Program certification was set to occur on May 28, 2004.  Id.  Faced with the likely loss of the vast majority of its sales leading to termination as an operating company, Alacritech sued Microsoft on antitrust and unfair competition grounds.  Id.  A settlement in that case was reached and the case was voluntarily dismissed on July 15, 2004.  Id.

On May 4-6, at WinHEC 2004, Microsoft provided further details about Chimney, which confirmed how closely Chimney copied Alacritech's technology and patents.   Craft Dec., ¶15.  WinHEC 2004 also showcased a demonstration of a network interface card (NIC) working with an early version of Chimney and infringing Claim 1 of the '868 patent.  Id.  The NIC was made by Alacritech hardware competitor Broadcom Corporation.  Id.  Alacritech was disinvited from demonstrating its hardware working with Chimney at WinHEC 2004 because Alacritech insisted that Microsoft must pay for a license to use Alacritech's technology.  Id.

At WinHEC 2004 Microsoft also distributed DVDs to other hardware competitors, the DVDs containing software that infringes Claim 1 of the '868 patent and instructions that induce infringement of that claim. Id.

Microsoft was clearly dealing with Alacritech according to the pattern of behavior that Microsoft has used with many other innovative companies: express interest in a new technology, obtain secrets detailing the technology, steal the technology, integrate it into Windows, and crush the company.[1] Microsoft also has been providing newer versions of the Chimney software to Alacritech's hardware competitors while excluding Alacritech, so that those competitors will have a head-start compared to Alacritech should Chimney be publicly released. Id. Several of those hardware competitors are much larger than Alacritech, so that their head-start could prove fatal to Alacritech. Boucher Dec. ¶17.

Faced with the realization that it had little hope of fair negotiations with Microsoft, Alacritech filed this lawsuit. In this motion, Alacritech seeks to enjoin Microsoft from further direct and indirect infringement of Claim 1 of the '868 patent. This motion seeks relief *pendente lite* to prevent continued infringement by Microsoft, which would continue to undermine Alacritech's business. Moreover, this motion seeks to prevent the widespread public release of Chimney software by Microsoft, which would induce a flood of infringing competition by multiple hardware competitors. Id.

## III. DISCUSSION

### A. The Standard for a Preliminary Injunction

"Whether to grant or deny a motion for preliminary injunction is a decision committed to the sound discretion of the district court, which must consider four factors: (1) the likelihood that the patentee will succeed on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *Oakley,*

---

[1]See, e.g., Burst.com (*Cox et al v. Microsoft*, D. MD, 1:00-md-01332-JFM); *InterTrust Techs. Corp. v. Microsoft Corp.*, N.D. Cal., C 01-1640 SBA; *Stac Electronics v. Microsoft Corp.*, Civil No. 93-0413-ER (C.D. Cal. 1994).

*Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)." *Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*, 85 Fed. Appx. 205, 208 (Fed. Cir., 2003).

1.      Alacritech Will Succeed on the Merits

In order to succeed on the merits, Alacritech must prove that Microsoft infringes at least one valid claim. "An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. 'First, the court determines the scope and meaning of the patent claims asserted . . . [Secondly,] the properly construed claims are compared to the allegedly infringing device.'" *Oakley* at 1339 (*citations omitted*). "An assessment of the likelihood of validity of a patent claim over the prior art also involves a two-step process. The first step is the same claim construction implicated in an infringement analysis." *Id*.

For the convenience of the Court, Alacritech has selected only one claim for supporting this motion, Claim 1 of the '868 patent, although Microsoft clearly and willfully infringes many more valid claims of that patent, as will be subsequently shown.

Claim 1 of the '868 patent recites:

> A set of instructions executable on a processor, the set of instructions being for performing steps comprising:
> establishing a TCP connection, the TCP connection being at least in part identified by a TCP source port, TCP destination port, IP source address, and IP destination address; and
> offloading the TCP connection from the processor to an intelligent TCP offload mechanism.

i.      Claim Construction of Claim 1 of the '868 Patent

Exhibit A is a claim construction chart for Claim 1 of the '868 patent. As is evident from that claim chart, very few terms can realistically be disputed in Claim 1. "TCP" stands for Transmission Control Protocol, a well-known set of rules that provide for reliable transfer of messages over networks and the Internet. Lauer Dec., ¶¶3-4; Almeroth Dec., Exhibit P. The TCP standard has been in place since 1981, a virtual eternity in computer lifecycles. Thus, terms from Claim 1 such as "establishing a TCP connection" are well known by those

of ordinary skill in the art.   Indeed, all the terms of Claim 1 are well known and indisputable except possibly 1) "offloading" and 2) "an intelligent TCP offload mechanism."  In Claim 1, "offloading the TCP connection from the processor" means transferring the TCP connection from the processor, which reduces the load on the processor.  The specification of the '868 patent describes TCP Offload Handout commands that can accomplish this transfer.  The phrase "an intelligent TCP offload mechanism" means a network interface that is capable of accepting the established TCP connection from the processor and performing TCP processing associated with the connection.  Examples of such a network interface that are described in the '868 specification include an Intelligent Network Interface Card (INIC), a Communication Processing Device (CPD) and related device drivers.

ii.     Microsoft Infringes Claim 1 of the '868 Patent

Microsoft has infringed Claim 1 of the '868 patent and continues to infringe that claim, both directly and by inducing and contributing to infringement by others, as detailed in the Declaration of Dr. Kevin Almeroth, Associate Professor & Vice Chair, Department of Computer Science, University of California, Santa Barbara.

For example, at WinHEC 2004 Microsoft distributed DVDs containing Longhorn build 4074 (Craft Dec., ¶¶14) that infringes Claim 1 of the '868 patent.  Almeroth Dec., ¶¶27-51.  The DVD's also contain instructions for using the Longhorn software with network interface cards, inducing each of the many companies that attended that conference and received those DVDs to infringe that claim.  Id., ¶¶92-98.

At WinHEC 2004, Microsoft also provided a demonstration of Chimney software working with a Broadcom C-NIC to infringe Claim 1 of the '868 patent.  Id., ¶¶52-56.  Video copies of that demonstration and others demonstrating and inducing infringement can be purchased from Microsoft's web site.[2]  At WinHEC 2004, Microsoft was well aware of the '868 patent, for which a license had been discussed. Craft Dec., ¶14.

---

[2]See http://www.microsoft.com/whdc/winhec/WH-in-a-box.mspx.

Microsoft also provided a "white paper" entitled "Scalable Networking: Network Protocol Offload—Introducing TCP Chimney," which describes Microsoft's Chimney software as operating in a way that infringes Claim 1 of the '868 patent, and encourages others to infringe that claim. Almeroth Dec., Exh. N. That white paper is also publicly available on Microsoft's website,[3] demonstrating Microsoft's continuing inducement of others to infringe Claim 1 of the '868 patent.

Moreover, Microsoft is providing updates of Chimney software that further induce Alacritech hardware competitors to infringe, yet withholding such updates from Alacritech. Craft Dec., ¶ 15. This gives Alacritech's hardware competitors a head-start in marketing Alacritech's patented technology in concert with the Windows operating system monopoly, in violation of the *U.S. v. Microsoft* Final Judgment.[4]

### iii.       Claim 1 of the '868 Patent is Clearly Valid

Alacritech is confident in the validity of Claim 1. Initially, note that well over 100 reference documents were considered by the Examiner before the '868 patent was allowed to issue, buttressing the presumption that Claim 1 is neither anticipated nor obvious. Claim 1 is entitled to a presumption of validity (35 U.S.C. § 282), and Microsoft faces the burden of showing, by *clear and convincing evidence*, the invalidity of the claim. *Hewlett-Packard Co. v. Bausch & Lomb*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). "This burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Id*.

"In the context of a preliminary injunction, while 'the burden of proving invalidity is with the party attacking validity,' the party seeking the injunction 'retains the burden of showing a reasonable likelihood that the attack on its patent's validity would fail.'" *Oakley*, 316 F.3d at 1339 (*citations omitted*). Thus, although the '868 patent is presumed to be valid, and that presumption can only be overcome by *clear and convincing* proof, the following

---

[3] www.microsoft.com/whdc/device/network/TCP_Chimney.mspx.
[4] *U.S. v. Microsoft*, (D.D.C 98-1232 (CKK), Final Judgment, November 12, 2002, ¶ E.

discussion provides additional reasons that reinforce the plain validity of that patent.

It is clear that no reference of record anticipates the claim at issue, and so the following discussion concentrates on the issue of obviousness.

> "Obviousness is a question of law based upon underlying factual determinations." Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc., 21 F.3d 1068, 1071, 30 U.S.P.Q.2D (BNA) 1377, 1378 (Fed. Cir. 1994) (internal citations omitted). Relevant underlying facts include: 1) the scope and content of the prior art; 2) the differences between the prior art devices and the claimed invention; 3) the level of ordinary skill in the art; and 4) objective considerations, such as commercial success, long felt need, failure of others, and copying. Graham v. John Deere Co., 383 U.S. 1, 17-18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966).

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344 (Fed.Cir. 2001).

Applying the criteria recited above leads to a straightforward conclusion that Claim 1 is not obvious: 1) the scope and content of the prior art is represented by the reference documents that were considered by the patent Examiner before allowing the '868 patent to issue; 2) those reference documents also provide an indication of the level of skill in the art; and 3) it is evident that those references would not have, alone or in combination, taught or suggested all the limitations of Claim 1 of the '868 patent at the time of that invention. Thus it is clear that Claim 1 of the '868 patent is nonobvious over those references and any that are cumulative.

Moreover, while it is clear that nonobvious differences exist between Claim 1 and the prior art, additional "objective considerations" reinforce the determination that the Claim 1 is nonobvious, even though the lack of such "objective considerations" would not imply that the claim was obvious.[5] "These objective indicia 'may often be the most probative and cogent evidence [of nonobviousness] in the record.'"[6] The following discussion of some objective considerations provides additional support for the conclusion that Claim 1 is nonobvious.

There is ample evidence of failure of others to accomplish what is defined by

---

[5] *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 739 n.13 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987).
[6] *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

Alacritech's claims. For example, Microsoft was interested in Alacritech's inventions in 1998 and Alacritech provided Microsoft with detailed descriptions of how to integrate Alacritech's TCP offload software into the Windows operating system in early 1999, and Microsoft at that time presented a schedule for integrating Alacritech's technology into a future Windows operating system, yet in late 2004 Microsoft still does not have a beta version of Chimney software available. Craft Dec., ¶¶4-11. There is no evidence that Microsoft delayed beginning the project that it now calls Chimney. This failure of perhaps the largest software company in the world, with perhaps the largest research and development budget and the greatest number of software engineers in the world, to accomplish what Alacritech invented and brought to market a number of years ago, despite Alacritech providing Microsoft with a description of how to implement the software, is strong proof of the nonobviousness of Claim 1 of the '868 patent.

In addition to Microsoft, other companies have tried unsuccessfully to develop the technology invented by Alacritech. Boucher Dec., ¶18. As noted above, several large companies have announced plans to provide TCP offload software, yet only EMC, which has licensed Alacritech's technology, is actually offering systems that have integrated TCP offload software, those systems having been developed with Alacritech's assistance. Id. The failed attempts of several large companies to offer working TCP offload products is accentuated by their purchase of startup companies that were formed to develop TCP offload products. For example, Emulex purchased both Giganet and Trebia. Id. Adaptec purchased Platys. Id. Qlogic bought Little Mountain Group. Id. Similarly, Lucent Technologies announced a TCP/IP offload card several years ago, but only shipped its data sheet. Id. Intel then acquired the technology from Lucent, and also has not shipped a product using it. Id.

Another of the "objective considerations" that indicates nonobviousness is the derivation if not wholesale copying of Alacritech's software inventions by Microsoft.[7] Craft

---

[7] See, e.g., *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285-1286 (Fed. Cir. 2000), in which the Federal Circuit held that evidence of an accused infringer's "repeated failures to design the claimed invention" and "wholesale copying" was "potentially outcome

Dec, ¶¶7-11. In addition to Microsoft copying the invention defined by Claim 1, EMC and Sun Microsystems have announced that they will offer TCP offload software that performs the same functions. Boucher Dec., ¶19. Major companies that have announced that they will work with Microsoft's Chimney software include Broadcom, Intel, Qlogic, Adaptec, Emulex and NVIDIA. Id. In addition, a number of startup companies have been formed to provide a TCP Offload Engine (TOE), including Astute Networks, Archway Digital Solutions, Chelseo, Giganet, Little Mountain Group, Platys, S2I/O, Siliquent, Silverback and Trebia. Id.

Microsoft's Laudatory statements about Alacritech's TCP/IP offload inventions also show the nonobviousness of Claim 1.[8] For example, in a May 4, 2004 press release, Steve Anderson, director, Windows Server Marketing, Microsoft said: *"Alacritech's ground-breaking efforts in the area of TCP/IP offload have been fundamental in enabling us to prove the capability and value of this technology."* Lauer Dec., ¶8.

The opinion of experts at the time Alacritech's inventions were first announced also points to nonobviousness.[9] Bob Metcalf, Internet pioneer and founder of 3Com, nicknamed "Father of Ethernet," noted at the time that Alacritech's products were introduced in April of 2000 that "Internet experts are against moving TCP/IP from software on general-purpose microprocessors into special-purpose silicon. Their studies show that TCP/IP software has no hot spots (frequently executed code) that would speed up significantly in silicon." Id., ¶6. "Boucher will counter these studies with racks of NICs, each four ports of 100Mbps Ethernet running wire-speed TCP/IP with reduced server loads. Old software-stack NICs will saturate an entire Intel Xeon processor delivering only 400Mbps of TCP/IP. New Alacritech silicon-

---

determinative on the issue of obviousness." See also *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1999 (Fed. Cir. 1985); *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1564, 7 USPQ2d 1548, 1554 (Fed. Cir. 1988).

[8] See, e.g., *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579, 42 USPQ2d 1378, 1384 (Fed. Cir. 1997).

[9] See, e.g. *Vulcan Engineering Co., Inc. v. Fata Aluminum*, Inc., 278 F.3d 1366, 1373, 61 USPQ2d 1545 (Fed. Cir. 2002), cert. denied, 123 S. Ct. 81 (2002); *United States v. Adams*, 383 U.S. 39, 148 USPQ 479 (1966).

stack NICs will deliver 800Mbps with only 20 percent of a Xeon, Boucher says."  Id.

Similarly, John L. Hufferd states: "During the second half of 1999, I met with a number of TCP/IP vendors and NIC vendors to discuss the possibility of a TOE.  They said that a TOE on a chip was not possible or reasonable."  Id., ¶7.  Alacritech had already solved this conundrum in part by establishing a TCP connection on a processor and offloading the connection to a TCP offload mechanism such as a TOE, as recited in claim 1 of the '868 patent, so that the TOE could be less complicated.

        2.      <u>Alacritech Will Suffer Irreparable Harm if the Injunction is Not Granted</u>

"Irreparable harm is presumed when a clear showing of patent validity and infringement has been made."[10]  Notwithstanding this presumption, it is clear that Alacritech will be irreparably harmed if a preliminary injunction does not issue and Microsoft is allowed to continue to infringe and to continue to induce infringement.  Boucher Dec., ¶23.  Alacritech is a small start-up company which will not be able to withstand the flood of infringing competition from much larger and better known hardware vendors that will occur if Microsoft makes Chimney software publicly available.  Id.  Alacritech's market share and profit margins are both likely to suffer from this flood of infringement, by amounts that are impossible to exactly quantify, making damages inadequate.  Id.  Although the limited term of the '868 patent is sufficient to demonstrate irreparable harm if a preliminary injunction does not issue,[11] computer-related inventions such as those defined by claim 1 of the '868 patent are likely to have an even shorter lifetime than the statutory term of the patents that cover them (Boucher Dec., ¶23), and so an even stronger need for relief *pendente lite*.[12]

---

[10] *Oakley,* 316 F.3d at 1345; *Pharmacia & Upjohn,* 85 Fed. Appx. 205 at 214.

[11] *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

[12] See, e.g., *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985): "While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement. The patent statute further provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. If monetary relief were the sole relief afforded by the patent statute then injunctions would be

Moreover, Microsoft has been discouraging manufacturers from buying or licensing Alacritech's technology by promising that Microsoft will soon have Chimney available and by denigrating Alacritech's technology. Craft Dec., ¶17-18. At WinHEC 2004, Microsoft stated that Chimney software would be available as a software download "pack" prior to the release of Microsoft's next operating system, and told conference attendees including original equipment manufacturers (OEMs) not to use Alacritech products, but to wait for Chimney to be available. For example, James Pinkerton, labeled as the "Architect" of Chimney, told WinHEC 2004 attendees that Chimney would offer an integrated approach, rather than what he called "a wart on the side of the protocol stack," referring to Alacritech's products. Id. Ironically, Alacritech disclosed to Microsoft an integrated design upon which Chimney is based and for which Mr. Pinkerton claims credit prior to Mr. Pinkerton's arrival at Microsoft.

Similarly, Microsoft earlier this year tried to terminate the WHQL certification for all of Alacritech's products, which would have halted the vast majority of Alacritech's sales. Boucher Dec., ¶24. Ironically, not only is Microsoft's Chimney based on Alacritech's technology but Microsoft used Alacritech's technology to demonstrate improved performance for Microsoft's release of Windows 2003. Id., ¶13. Spreading fear, uncertainty and doubt (FUD) is a well-known Microsoft tactic for which damages are not adequate. Id.

Microsoft's continuing infringement of the '868 patent also encourages other companies to infringe, whereas an injunction would discourage such infringement. Id., ¶25. Any company that has paid for, or is considering paying for, a license to Alacritech's patents must wonder why it needs a license while Microsoft is allowed to infringe without restraint.

Although difficult to quantify,[13] price erosion and lost profits will continue to occur if Microsoft is allowed to continue infringing the '868 patent. Boucher Dec., ¶26. Without an injunction, Alacritech will be forced to match the price of their lowest cost competitor, which

---

unnecessary and infringers could become compulsory licensees for as long as the litigation lasts."
[13] See, e.g., *Polymer Techs. v. Bridwell*, 103 F.3d 970, 975-976 (Fed. Cir. 1996).

would likely be one of several very large, well-known companies with great economies of scale, requiring Alacritech to sell at a loss. Id. Such price erosion, especially in the computer industry, may be impossible to reverse. Alacritech has spent over seven years and many millions of dollars developing this technology and attempting to market it despite opposition from Microsoft. Id. Absent an injunction, Alacritech's inventions will be turned against it in a flood of infringing competition that will likely destroy Alacritech. Id.

3. <u>Balancing the Hardships Weighs Heavily in Alacritech's Favor</u>

Microsoft's development of Chimney apparently began with the misappropriation of Alacritech's confidential information more than five years ago. There is no evidence that Microsoft tried to independently develop technology. In other words, the "development" of Chimney that Microsoft has done so far amounts only to stealing that which was accomplished by Alacritech. Thus, Alacritech's requested preliminary injunction would only prevent Microsoft from infringing technology that Microsoft did not develop.

Moreover, Microsoft's Chimney software is not yet available to the public. Unlike some patent plaintiffs, Alacritech did not wait for its technology to be embedded in the next operating system before filing suit and requesting an injunction. Microsoft would not need to pull its products from the shelf. Microsoft would not need to rewrite its current operating system, and the scheduled release of its future operating system (Longhorn) is at least a year away. Thus the harm to Microsoft if an injunction were to issue would be limited.

On the other hand, as noted above, the harm to Alacritech if an injunction does not issue would be severe and irreparable. Although Microsoft and other large competitors of Alacritech have other products that would not be affected by Alacritech's requested injunction, all of Alacritech's current products are covered by Claim 1 of the '868 patent, and all would suffer if an injunction does not issue.

4.    <u>The Public Interest Weighs in Favor of Granting the Injunction</u>

Microsoft's willful infringement of Alacritech's inventions flaunts the strong public interest in rewarding innovation, and contravenes the strong public interest in deterring anticompetitive behavior.[14]  "A patentee is awarded a patent for disclosure of a patentable invention 'to promote the Progress of . . . useful Arts.' U.S. Const. art I, § 8, cl. 8." *King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995).  Although Alacritech would be entitled to an injunction preventing Microsoft from infringing the '868 patent after the public release of Chimney software, prior to such public release the public interest weighs even more heavily in favor of an injunction.  Were an injunction to issue that forbids Microsoft from implementing the Longhorn operating system, the public interest would be served by having the injunction issue early, before the ramifications and disruptions of the injunction are felt by the public.  Public policy favors deciding the merits of this motion sooner rather than later.

**IV**.    **CONCLUSION**

For all the foregoing reasons, the Court should grant Alacritech's motion for a preliminary injunction.

Dated: November 19, 2004                    By:    /S/ Mark A. Lauer
                                            SILICON EDGE LAW GROUP LLP
                                            Attorneys for Plaintiff,
                                            ALACRITECH, INC.

---

[14] Microsoft's behavior in this case may be egregious but is not surprising, as it fits a pattern with which Microsoft has been quite successful: express interest in a new technology, obtain secrets detailing the technology, steal the technology, integrate it into Microsoft's dominant operating system and destroy the company that invented the technology.  Innovative companies approach Microsoft with new technology because Microsoft has a monopoly on operating systems with which the technology interoperates.  A favored Microsoft means for "out competing" the company that invented the technology is to offer it for "free" as part of Windows.  The adjudicated monopoly power enjoyed by Microsoft allows its operating system to be overpriced, so that Microsoft can more than make up for the "free" technology. The additional cost to society for Microsoft's behavior is that innovation is not rewarded and encouraged, but instead the creativity, hard work, time and money that led to the innovation is misattributed to Microsoft, and competition with Microsoft is crushed.